UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LTTR HOME CARE, LLC and ALAN
LANDAUER,

                        Plaintiffs,

           v.

CITY OF MOUNT VERNON
INDUSTRIAL DEVELOPMENT
AGENCY; MAYOR RICHARD THOMAS,
in his individual and official capacities; and
ROBERTA JAMES, in her individual and
official capacities,

                    Defendants.

No. 17-CV-9885 (KMK)

OPINION & ORDER

Appearances:

Matthew John Acocella, Esq.
Lowey Dannenberg P.C.
White Plains, NY
*Counsel for Plaintiffs*

Helen Collier Mauch, Esq.
Zarin & Steinmetz
White Plains, NY
*Counsel for Plaintiffs*

Jeffrey D. Buss, Esq.
Nancy Durand, Esq.
Spolzino, Smith, Buss & Jacobs, LLP
Yonkers, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

      LTTR Home Care, LLC ("LTTR") and Alan Landauer ("Landauer") (collectively,

"Plaintiffs") bring this Action against the City of Mount Vernon Industrial Development Agency

("MVIDA"), Mayor Richard Thomas ("Thomas") in his individual and official capacities, and

Roberta James ("James") in her individual and official capacities (collectively, "Defendants"),

alleging that Defendants orchestrated a scheme to prevent Plaintiffs from obtaining a tax abatement necessary to facilitate the sale of Plaintiffs' property. (*See* Second Am. Compl. ("SAC") (Dkt. No. 28).) Plaintiffs assert claims under the First and Fourteenth Amendments, the New York State Constitution, the New York General Municipal Law ("GML"), and common law. (*See id.* ¶¶ 213–339.) Before the Court is Defendants' Motion To Dismiss (the "Motion"). (*See* Not. of Mot. (Dkt. No. 34).) For the following reasons, the Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint, and are taken as true for the purpose of resolving the instant Motion.

Landauer is a "managing member" of LTTR, a limited liability company organized and existing under the laws of the State of New York that owns property located at One Bradford Road, Mount Vernon, NY 10553 (the "Property"). (SAC ¶¶ 18–20.) MVIDA is a public benefit corporation formed pursuant to the New York State Industrial Development Agency Act. *See* GML §§ 850 *et seq.* & § 902-c. (SAC ¶ 21.)[1] MVIDA issues industrial revenue bonds and provides property, mortgage, and sales tax exemptions to promote economic development in Mount Vernon. (*Id.* ¶ 23.) Thomas is the Mayor of Mount Vernon and Chairman of MVIDA, (*id.* ¶¶ 26–27), and James is the Business Development Director of MVIDA, in addition to operating as an independent real estate agent for private clients, (*id.* ¶¶ 32, 35). Previously, James served as Thomas's Campaign Manager and ran his Inaugural Committee. (*Id.* ¶ 63.)

---

[1] By statute, MVIDA has the power to "sue and be sued." *See* GML § 858.

James was appointed to MVIDA on January 31, 2017, earning an annual salary of $86,000 plus "fringe benefits," but continued to operate her own private real estate firm. (*Id.* ¶ 65.)

Plaintiffs purchased the Property in 2001; it is situated in a predominately residential area bordered on the south by Metro-North Railroad and to the west by Wilson Woods Park. (*Id.* ¶ 39.) Prior to 2014, the Property was zoned for light industrial use, but it is currently zoned for multi-family dwellings. (*Id.* ¶¶ 40–42.) A 52,000 square foot office building and warehouse facility is located on the Property. (*Id.* ¶ 44.) For approximately 15 years, Landauer used the Property and the building to operate his medical supply business, which included storing home health equipment and medical supplies. (*Id.*) In 2013, Landauer's medical supply business faced financial difficulties and ceased operations; soon after, Landauer engaged a broker to market and sell the Property. (*Id.* ¶ 46.) Landauer intended to use the proceeds of the sale to pay off debts and to fund his and his wife's retirements. (*Id.* ¶ 48.)

In 2014, WP East Acquisitions, LLC ("WP") expressed an interest in purchasing the Property and developing it for residential use. (*Id.* ¶ 49.) Because the Property was one of the last remaining industrial properties in the area, Plaintiffs and WP submitted an application to the Mount Vernon City Council (the "City Council") to rezone the Property from industrial use to multi-family residential use. (*Id.* ¶¶ 50–51.) On June 4, 2014, MVIDA "induced the WP East Project, finding that the WP East Project would result in a significant economic benefit to [Mount Vernon]." (*Id.* ¶ 53.) MVIDA and WP reached an agreement pursuant to which WP would make payments in lieu of real property taxes ("PILOTs") at a rate of $450,000 per year for a 20-year period. (*Id.* ¶ 54.) WP ultimately terminated its contract with Plaintiffs for reasons unrelated to MVIDA. (*Id.* ¶ 56.)

Thomas became Mayor of Mount Vernon in January 2016.  (*Id.* ¶ 57.)  In November

2016, The NRP Group LLC ("NRP"), a residential developer based in Cleveland, Ohio,

contacted Plaintiffs about developing the Property.  (*Id.* ¶ 69.)  On November 28, 2016, LTTR

entered into a Contract of Sale for the Property (the "Contract") with an NRP entity, NRP

Properties LLC, intending "to create a vibrant, luxury multi-use residential development

project."  (*Id.* ¶ 70.)  The Contract provided that the sale was conditioned upon the grant of a

property tax abatement by MVIDA, similar to the one MVIDA had previously granted WP.  (*Id.*

¶ 71.)

Plaintiffs allege that upon executing the conditional Contract, Plaintiffs and NRP

"entered into a contractual vendor-vendee relationship," pursuant to which "NRP acted as

Plaintiffs' authorized agent."  (*Id.* ¶¶ 72–73.)  This included being "personally involved and

work[ing] closely with NRP in creating plans for the Property and developing and submitting an

application for MVIDA financial assistance," as well as "assist[ing] and cooperat[ing] with NRP

on all necessary applications, including attending relevant meetings."  (*Id.* ¶¶ 74–75.)  Plaintiffs

also "worked hand in hand with NRP in advocating to Mayor Thomas, James[,] and MVIDA to

advance the application before MVIDA" and allow it to come to a vote.  (*Id.* ¶ 76.)  Landauer

"attended MVIDA meetings alongside NRP representatives in support of the Application" for a

tax abatement, and "was invited to meetings with Thomas and James, which he attended alone."

(*Id.* ¶ 77.)

Like the WP East Project, the NRP Project would consist of 120 luxury apartment units

to be constructed on the Property.  (*Id.* ¶ 80.)  On February 1, 2017, NRP submitted a Site Plan to

the Mount Vernon City Council, reflecting only minor changes from the previously-approved

WP East Project, such as "more visual and architectural integration with Wilson Woods Park,"

and the inclusion of "a basement parking level in order to reduce visible parking in front of the proposed building." (*Id.* ¶ 81.) On February 21, 2017, NRP, "following established MVIDA protocols," submitted an Application For Financial Assistance with Supporting Documents (the "Application") to MVIDA, seeking a 20-year tax abatement and exemptions from sales and mortgage recording taxes. (*Id.* ¶ 83.) The Application sought the same PILOT payment terms previously granted to WP. (*Id.* ¶ 84.) The Application allegedly "exceeded all of the requirements" of MVIDA's Uniform Financial Assistance and Benefits Reimbursement Policy (the "UFA Policy"), promulgated pursuant to GML § 859-a, which requires MVIDA to "develop, and adopt by resolution, uniform criteria for the evaluation and selection for each category of projects for which financial assistance will be provided." (*Id.* ¶ 85 (emphasis omitted).) "At a minimum," GML § 859-a requires that MVIDA conduct "an assessment [] of all material information included in connection with the application for financial assistance, as necessary to afford a reasonable basis for the decision by [MVIDA] to provide financial assistance for the project," and produce a "written cost-benefit analysis . . . that identifies the extent to which a project will create . . . jobs; the estimated value of any tax exemptions to be provided; the amount of private sector investment generated or likely to be generated by the proposed project[;] . . . the extent to which the proposed project will provide additional sources of revenue for municipalities and school districts; and any other public benefits that might occur as a result of the project[.]" (*Id.* ¶ 86.) "The UFA Policy further states that MVIDA *must* consider the benefits to be provided by a proposed project, including construction and other jobs created, tax revenues that will be generated, and the benefits to and impact of the project on the surrounding community and weigh them against the purported cost to Mt. Vernon, including

burdens on the school district, fire, police, waste collection[,] and water and sewer services, etc."
(*Id.* ¶ 88.)

The Application included a detailed analysis of the economic and fiscal impacts of the proposed NRP Project which indicated that the Project would create "approximately 49 new construction jobs, add approximately $1.34 million to the City's economy from new resident consumer spending, as well as provide a net tax benefit of $164,535 per year to the Mount Vernon City School District[,] [t]hus . . . overwhelmingly satisf[ying] the criteria set forth in the UFA Policy." (*Id.* ¶ 89.) After submitting the Application, "Plaintiffs reasonably believed that . . . MVIDA would follow its normal procedure, and take a vote on whether to preliminarily induce the NRP Project." (*Id.* ¶ 90.) Plaintiffs allege, "[u]pon information and belief," that "it is the policy and practice of the MVIDA, upon submission of a complete application, to: (a) place the application on the agenda for a preliminary presentation; (b) vote on preliminary inducement; (c) hold a public hearing; and (d) vote on a final determination." (*Id.* ¶ 92.) NRP, working with Landauer, requested that its Application be placed on MVIDA's February 28, 2017 Agenda. (*Id.* ¶ 94.) MVIDA refused to place NRP's Application on the February 28, 2017 Agenda "without offering any reason." (*Id.* ¶ 95.) However, on March 8, 2017, the City Council reviewed the NRP Site Plan, "and affirmed the prior State Environmental Quality Review Act Findings of no significant adverse environmental impacts." (*Id.* ¶ 96.) "Many residents came to speak in favor of the NRP Project, and wrote letters of support." (*Id.* ¶ 97.)

On March 22, 2017, in his State of the City Address, Thomas announced:

> There has been much debate and discussion around Wilson Woods Park and the potential development along Bradford Road. This park belongs to the people of Mount Vernon, and it's my belief that it must always be open and accessible for all to enjoy. I recommended to the current developer that this site be transformed into a boutique hotel with a conference center so businesses can get business done, catering hall for weddings, retirements, baptismals, celebratory events that we all

want to share in because we need places that we can go to that generate memories but also sales tax revenue for Mount Vernon. That's how we reduce the property tax pressure[,] by bringing in more business, not more residents without the right plan.

(*Id.* ¶ 99.)  Plaintiffs were "surprise[d] and shock[ed]" to learn of Thomas's intention for the Property, "as none of the potential purchasers of the Property at that time expressed any interest in developing a hotel or catering hall at the Property," and the Property was not "zoned for hotel or catering hall use."  (*Id.* ¶¶ 100–01.)

On March 29, 2017, one week after the State of the City Address, James contacted an NRP representative, and left a message in which she identified herself as being "with the City of Mount Vernon."  (*Id.* ¶ 104.)  When the NRP representative returned James's call, she stated that she was actually calling in her capacity as a private real estate broker, and asked if NRP would be interested in selling the Property to a hotel developer.  (*Id.* ¶¶ 105, 107.)  NRP explained that it did not yet own the property, and in any event was interested in developing an apartment complex, not a hotel.  (*Id.* ¶ 106.)

On March 31, 2017, NRP was allowed to make an introductory presentation of its proposed Project to MVIDA.  (*Id.* ¶ 108.)  MVIDA Board Members, excluding Thomas, "were receptive to the NRP Project."  (*Id.* ¶ 109.)  However, subsequent requests to be placed on a follow-up MVIDA agenda "were ignored by the MVIDA staff, and Mayor Thomas in particular, who controlled the MVIDA agenda."  (*Id.* ¶ 110.)  On May 2, 2017, and again on May 11, 2017, NRP representatives met with Thomas in an attempt to move the Application forward.  (*Id.* ¶ 111.)  At the May 2, 2017 meeting, Thomas indicated that he "would only support a recreational use of the Property, or a 'boutique' hotel use."  (*Id.* ¶ 112.)  At the May 11, 2017 meeting, Thomas explained that, although he was initially supportive of the NRP Project, "things had changed."  (*Id.* ¶ 114.)  Specifically, Thomas claimed that "due to a New York State

Department of Environmental Conservation ('NYSDEC') enforcement action against the City, which required the City to pay $40,000.00 in penalties and undertake an environmental cleanup of Memorial Field, he needed to increase sales tax receipts to the City, and thus he would only support a commercial use of Plaintiffs' property, repeating his demand for a hotel or catering hall." (*Id.* ¶ 114.) He also stated that he "intended to 'slow play' the NRP Project." (*Id.* ¶ 115.) "NRP kept Landauer apprised of all developments in accordance with its relationship as contract vendee." (*Id.* ¶ 116.)

Also on May 11, 2017, James called Landauer, identifying herself as a "director of the MVIDA," and said she wanted to talk to Landauer about "'her client, who might be interested in developing a hotel' on the Property." (*Id.* ¶¶ 117–18.) Landauer "felt he had no choice but to meet with James." (*Id.* ¶ 119.) At their meeting on an unspecified date, Landauer told James that he would honor his Contract with NRP, and James "reiterated that Mayor Thomas was not in favor of the NRP Project, and instead wanted a hotel on the Property," and advised Landauer that MVIDA "would not approve NRP's current Application." (*Id.* ¶¶ 121–23.) Throughout the meeting, James "repeatedly emphasized her 'close relationship' with Mayor Thomas, and reminded Landauer that she had served as Thomas'[s] Campaign Manager." (*Id.* ¶ 124.) On a subsequent phone call, James demanded that Landauer "give her an exclusive" on the Property. (*Id.* ¶ 125.) Soon thereafter, Landauer received a call from two developers who wanted to meet with him; at the meeting, "the men claimed to have developed hotels in the area, but also said that they had no financial backing." (*Id.* ¶ 126.) Landauer "told them that he had a contractual obligation to sell the Property to NRP, which he intended to honor." (*Id.*)

At some point in May 2017, Landauer met with Thomas "to express his concern with the MVIDA's delay in voting on the NRP Application." (*Id.* ¶ 127.) Plaintiffs allege that

"MVIDA's Bylaws and governing statutes required MVIDA to vote on the Application." (*Id.* ¶ 128.) At a meeting on May 17, 2017, Thomas told Landauer that he would support the NRP Project only if NRP added either a retail component or a 75-room hotel to its plans. (*Id.* ¶ 129.) Landauer explained "that there was no market demand for a hotel or major retail use at the Property," and that "adding commercial uses to the plans would adversely affect the economics of the NRP Project because Mount Vernon does not have a strong retail demand, especially in the location of the Property." (*Id.* ¶ 130.) Nevertheless, Landauer believed Thomas would support the Project "if the plans were revised to include some limited public retail space," and NRP agreed to add a retail food truck and picnic area to the plans "in the hopes that it would move the Project forward." (*Id.* ¶¶ 131–32.) NRP notified MVIDA of the addition, and were told MVIDA "would get back to" them with Thomas's reaction, "but never did despite repeated requests by NRP." (*Id.* ¶¶ 134–35.) NRP and Landauer made repeated requests to place the Application on MVIDA's June Agenda, but the requests were ignored. (*Id.* ¶¶ 136–37.)

On June 1, 2017, Thomas's office invited Landauer to attend a MVIDA meeting the following day. (*Id.* ¶ 138.) Landauer attended the meeting, at which MVIDA voted unanimously "to preliminarily induce another residential project with 179 apartment units, known as the Enclave at Fleetwood." (*Id.* ¶¶ 140–41.) Other residential developers also presented proposed projects at that meeting, but there was no discussion of the NRP Project. (*Id.* ¶¶ 142–43.) Landauer later learned that that MVIDA "voted upon and approved final inducement resolutions" for the Enclave and one other residential development by MVP Realty Associates, LLC ("MVP"). (*Id.* ¶¶ 142, 144.) Plaintiff asserts that "[t]he clear message to Plaintiffs and NRP was that Thomas intended to block residential development at the Property, and that only a hotel or catering project, or some other project, with his and James'[s] support

would gain MVIDA assistance." (*Id.* ¶ 146.)  Defendants "knew that financial assistance from the MVIDA was a pre-condition to the sale of the Property from LTTR to NRP." (*Id.* ¶ 148.)

On June 6, 2017, NRP requested a meeting with Thomas to discuss the revised development plan. (*Id.* ¶ 149.)  Plaintiffs then sent a letter dated June 14, 2017 to Thomas and MVIDA complaining that the failure to make a determination on Plaintiff's Application "may cause Plaintiffs to incur costs and may cause damages, and that should the City maintain its current position, Plaintiffs would explore legal alternatives." (*Id.* ¶ 150.)  On June 25, 2017, counsel for NRP met with two MVIDA staff members, Elvis Cordova ("Cordova") and Stacey Brayboy ("Brayboy"). (*Id.* ¶ 151.)  NRP "consulted with Landauer and his representatives throughout the proceedings." (*Id.* ¶ 152.)  NRP's counsel explained to Cordova and Brayboy that MVIDA "had a duty to at least hear the NRP Application, and vote on it." (*Id.* ¶ 160.)  However, the Application was not placed on the MVIDA agenda in June or July. (*Id.* ¶ 160–61.)

On August 10, 2017, NRP met with Thomas and Cordova and presented the new retail component of the NRP Project, and asked to be placed on MVIDA's next agenda. (*Id.* ¶¶ 162–63.)  Thomas allegedly "became indignant," (*id.* ¶ 164), stood up, and "started to storm out of the meeting" because one of the participants "failed to address him as 'Mayor' Thomas," (*id.* ¶ 166).  At the end of the meeting Thomas "declar[ed] that 'he was the Mayor,' and [that] he would 'think about' putting NRP and the Project on the MVIDA's agenda." (*Id.* ¶ 167.)

In early September, NRP was notified that the Application would be on the September agenda. (*Id.* ¶ 168.)  However, when NRP arrived at the MVIDA meeting on September 13, 2017, NRP was not on the agenda as promised; NRP nonetheless asked MVIDA to vote on its Application. (*Id.* ¶¶ 169–70.)  Thomas repeatedly told NRP to sit down, and said, "we will not act on your Application," refusing to allow MVIDA to vote on it. (*Id.* ¶¶ 171–73.)

Because NRP was unable to secure MVIDA approval on which the Contract was conditioned, it was forced to terminate the Contract on September 25, 2017.  (*Id.* ¶ 174.) Landauer took the Property off the market during the pendency of NRP's Application, and committed significant time and resources assisting NRP in the process of winning MVIDA approval.  (*Id.* ¶ 177.)  On October 17, 2017, James called Landauer and told him that she "might have a hotel interested" in purchasing the Property.  (*Id.* ¶ 180.)  James asked Landauer to "give her an exclusive" on the sale of the Property; Landauer refused.  (*Id.* ¶ 181.)  Plaintiffs' existing broker has been unable to sell the Property; Plaintiffs allege, upon information and belief, that "potential purchasers are aware of Thomas'[s] obstructionist tactics and his collusion with James to limit the use of the Property to a hotel or catering hall and retaliation against Plaintiffs."  (*Id.* ¶ 183.)  "Defendants' conduct . . . has operated as a complete bar to sale of the Property," as "[r]ecent potential buyers have concluded that Thomas will sabotage any attempt to develop the Property."  (*Id.* ¶ 184.)  Thomas has "categorically refused to talk or engage with any prospective purchasers of Plaintiffs' Property . . . [,] driving away two additional prospective buyers from deals to purchase the Property."  (*Id.* ¶ 185.)  This included an agreement with Alfred Weissman Real Estate, LLC ("Weissman"), who planned to develop a hotel on the Property; the sale was conditioned on Weissman "obtaining all necessary approvals . . . , including receiving a rezoning of the Property for hotel use."  (*Id.* ¶ 186.)  Thomas ignored requests to meet to discuss his support for the rezoning proposal, and Weissman subsequently terminated its contract with Plaintiffs on June 8, 2018.  (*Id.* ¶¶ 187–93.)  An additional prospective buyer entered into preliminary discussions with Plaintiffs about the Property in June and July 2018; however, after requests to meet with Thomas were ignored, the negotiations were terminated.  (*Id.* ¶ 194.) Plaintiffs allege that Thomas's refusal to speak with prospective purchasers was "in direct

retaliation against Plaintiffs for their commencement of this litigation and an Article 78 proceeding . . . against the City and MVIDA for refusing to honor a Freedom of Information Law (FOIL) request for documents related to the conspiracy alleged herein." (*Id.* ¶ 196.) As a result of Thomas's refusal to engage with prospective buyers, the Property remains "vacant and unmarketable" today. (*Id.* ¶ 197.)

Plaintiffs assert 12 causes of action against Defendants. The first three causes of action are for violation of Plaintiffs' First Amendment rights, and the fourth cause of action is for violation of Plaintiffs' free association rights under the corresponding provision of the New York State Constitution. (*See id.* ¶¶ 213–58.) The fifth cause of action is for violation of the Equal Protection clause of the Fourteenth Amendment. (*Id.* ¶¶ 259–80.) The sixth cause of action is for conspiracy to violate Plaintiffs' constitutional rights. (*Id.* ¶¶ 281–90.) The seventh, eighth, and ninth causes of action, brought only against James, are for violation of GML §§ 801 and 805. (*Id.* ¶¶ 291–310.) The tenth cause of action is a common law "conflict of interest" claim against Thomas and James. (*Id.* ¶¶ 311–19.) The eleventh and twelfth causes of action are for violation of N.Y. C.P.L.R. § 7803, which regulates administrative review. (*Id.* ¶¶ 320–33.)

Plaintiffs seek $5,037,500 in compensatory damages, attorneys' fees and costs, and an order removing James as a member of MVIDA "and directing Thomas and MVIDA to process all applications seeking financial assistance for as-of-right development on the Property in good faith." (*Id.* at 47–48.)

B.  Procedural Background

Plaintiffs filed the original Complaint on December 18, 2017. (*See* Compl. (Dkt. No. 1).) Plaintiffs filed a First Amended Complaint on April 16, 2018. (*See* First Am. Compl. ("FAC")

(Dkt. No. 23).) Plaintiffs filed the operative Second Amended Complaint on July 27, 2018. (*See* SAC.)

Defendants filed the instant Motion To Dismiss and accompanying papers on October 22, 2018. (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 36); Defs.' Aff'n in Supp. of Mot. To Dismiss ("Defs.' Aff'n") (Dkt. No. 37).) On December 6, 2018, Plaintiff filed a response. (*See* Pls.' Mem. of Law in Opp'n to Mot. To Dismiss ("Pls.' Mem.") (Dkt. No. 38); Pls.' Decl. in Opp'n to Mot. To Dismiss ("Pls.' Decl.") (Dkt. No. 39).) On January 11, 2019, Defendants filed a reply. (*See* Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Defs.' Reply") (Dkt. No. 40).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted).

B.  Analysis

Defendants move to dismiss the Complaint on grounds that Plaintiffs lack standing to assert claims based on failure to approve NRP's Application, that they have failed to state a claim, and that Thomas and James are entitled to qualified immunity.  (*See generally* Defs.' Mem.)

### 1.  Plaintiff's First Amendment Retaliation Claims

Plaintiffs assert three retaliation claims under the First Amendment: one based on retaliation for seeking MVIDA approval of the NRP Application; one based on retaliation against "Plaintiffs' decision not to associate with James"; and one based on Plaintiffs' filing of this lawsuit and a separate Article 78 proceeding.  (*See* SAC ¶¶ 213–48.)  Plaintiffs also assert a claim for violation of Article 1 of the New York State Constitution, (*see id.* ¶¶ 249–58), which contains "corollary provisions for the First Amendment's Free Speech and Free Association Clauses" that "are interpreted consistently with the Federal Constitution," based on the same conduct, *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 445–46 (S.D.N.Y. 2015).  Defendants argue that Plaintiffs fail to state a claim because their conduct in seeking a discretionary tax abatement from MVIDA was not protected; because they lack standing to assert the claim because it is NRP who sought the discretionary tax abatement; because they failed to plausibly allege retaliatory action; and because there is no causal connection alleged between James's attempt to secure business relating to the Property and any alleged retaliatory actions.  (*See* Defs.' Mem. 4–12.)

#### a.  Standing

"The Supreme Court has observed that 'the judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or

executive acts' and the federal courts are not 'merely publicly funded forums for the ventilation of public grievances.'" *Ctr. for Reprod. Law & Pol'y v. Bush,* No. 01-CV-4986, 2001 WL 868007, at *1 (S.D.N.Y. July 31, 2001) (alterations omitted) (quoting *Valley Forge Christian Coll. v. Ams. United for the Separation of Church & State, Inc.*, 454 U.S. 464, 471, 473 (1982)), *aff'd on other grounds*, 304 F.3d 183 (2d Cir. 2002). "The jurisdiction of federal courts is defined and limited by Article III of the Constitution . . . , [and] the judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.'" *Flast v. Cohen*, 392 U.S. 83, 94 (1968). "[A]t [the] uncontroverted core [of the 'case or controversy' requirement] lies the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001). "In order to meet that requirement, plaintiffs must, among other things, establish that they have standing to sue." *Am. Civ. Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) (citation omitted) [hereinafter *ACLU*]. To meet that minimum constitutional threshold of standing, a plaintiff must establish three things:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations, quotation marks, and alterations omitted). "[E]ach element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. At the pleading stage, a plaintiff need only "clearly . . . allege facts demonstrating" each element. *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

The injury-in-fact requirement is meant to "ensure that the plaintiff has a 'personal stake in the outcome of the controversy,'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth*, 422 U.S. at 498), and is "the proper party to bring this suit," *Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (citation and quotation marks omitted). "For an injury to be 'actual or imminent,' Plaintiffs must show that they have sustained or are immediately in danger of sustaining some direct injury, that is not conjectural or hypothetical." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 582 (S.D.N.Y. 2010) (citations, quotation marks, and alterations omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation and quotation marks omitted).

Plaintiffs argue that they have sufficiently alleged an injury-in-fact because they "have suffered personal financial loss arising from termination of contracts to purchase the Property." (Pls.' Mem. 7–8.) Plaintiffs also assert that their losses were caused by Defendants' conduct, which led to the termination of the Contract with NRP, as well as other subsequent interested buyers. (*Id.* at 8.)

Although it was the prospective purchasers who were directly impacted by Defendants' conduct, "[w]hen a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights." *Warth*, 422 U.S. at 505. Nevertheless, "it may make it substantially more difficult to

meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.*

Here, Plaintiffs have alleged sufficient facts to establish Article III standing based on their interest in the Property. Although it was NRP and other prospective purchasers who submitted applications for financial assistance from MVIDA, Defendants' retaliatory conduct, as alleged, was at least partially directed at, and in fact indirectly impacted, Plaintiffs' interest in the Property. Plaintiffs include numerous allegations that Defendants made clear to them that no plan to develop the Property would be approved unless it included the particular type of retail facilities envisioned by Thomas, thereby specifically targeting Plaintiffs' property interest. (*See* SAC ¶¶ 200–12.) Additionally, after Plaintiffs filed legal proceedings based on Defendants' conduct, Plaintiffs discovered that Thomas would not meet with any prospective purchasers about the Property, even those planning to build a hotel. (*Id.* ¶¶ 210–11.) Plaintiffs also allege that the delay has caused them "to incur substantial real estate taxes and mortgage payments" when they had hoped to sell and use the proceeds to fund Landauer's retirement. (*Id.* ¶ 204.) Defendants' alleged prevention of MVIDA from issuing financial assistance to any purchaser of the Property that did not include a hotel or other retail project undeniably had an impact on the value of Plaintiffs' Property, as it effectively reduced the price for which Plaintiff could sell and limited the types of purchasers to whom they could sell. *See Cunney v. Bd. of Trs. of Vill. of Grand View*, 56 F. Supp. 3d 470, 490 (S.D.N.Y. 2014) ("[N]otwithstanding [another entity's] ownership of the subject property, [the plaintiff] has personally suffered various forms of financial loss . . . . This satisfies the injury-in-fact requirement." (citing *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013))); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 550 (S.D.N.Y. 2014) ("Clearly, economic injuries . . . are judicially

cognizable."). Courts consistently hold that a non-owner of a property has standing to challenge unconstitutionally applied land regulations where they were personally economically harmed, *see Cunney*, 56 F. Supp. 3d at 492 (collecting cases); *a fortiori*, the same logic applies to a situation where, as here, the *owner* brings a constitutional challenge to land use determinations made against a third-party where they were personally economically harmed, *see Warth*, 422 U.S. at 504–05 ("The fact that the harm to [the plaintiffs] may have resulted indirectly does not in itself preclude standing. When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights."). Finally, because the harm was economic, "the injury will be redressed by a favorable decision," *Lujan*, 504 U.S. at 560–61 (citation and quotation marks omitted), as Plaintiffs can recover compensatory damages.

Therefore, at this early stage, Plaintiffs have sufficiently alleged that they have standing to bring their retaliation claims based on Defendants' refusal to grant financial assistance to any prospective purchasers of Plaintiffs' property. *Cf. Hampton Bays Connections, Inc. v. Duffy*, 127 F. Supp. 2d 364, 373 (E.D.N.Y. 2001) (declining to determine at the motion to dismiss stage which entity "actually filed the applications to construct the restaurant" at issue "in light of the limited discovery and early stage of the litigation").[2]

### b. The Merits

"A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse

---

[2] Defendants did not develop their standing argument in their opening memorandum at all. In their Reply, they rely on two cases from other circuits—one thirty years old and one unpublished—in support of their argument that Plaintiffs lack standing. (*See* Defs.' Reply 2–4

action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (citation and quotation marks omitted). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation and quotation marks omitted).

"The Second Circuit has not clarified whether a petition for rezoning constitutes a petition for redress of grievances, but has suggested that similar activities, such as an application for proposed development, do not." *In the Matter of the Application of Hampshire Recreation, LLC v. Vill. of Mamaroneck*, No. 14-CV-7228, 2016 WL 1181727, at *9 (S.D.N.Y. Mar. 25, 2016) (citing *Ridgeview Partners, LLC v. Entwhistle*, 227 F. App'x 80, 80–82 (2d Cir. 2007) ("[The plaintiff's] claim that [the defendants] have violated its right to petition the government for redress of grievances is legally insufficient because appellant's site-plan application does not purport to complain to public officials [or] to seek administrative [or] judicial relief from their actions." (citation and quotation marks omitted))), *aff'd*, 664 F. App'x 98 (2d Cir. 2016); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) (holding only that the "filing and continued prosecution of this action is conduct protected by the First Amendment" in case based on denial of application for permit to renovate property); *Old St.*

---

(citing *Frank Rosenberg, Inc. v. Tazewell County*, 882 F.2d 1165 (7th Cir. 1989) and *Miller v. Montgomery County*, 458 F. App'x 304 (4th Cir. 2011)).) Even if those cases were binding on this Court, and Defendants had raised their arguments in their opening memorandum, the cases are distinguishable because there, the plaintiffs' claims were predicated on the denial of the land use applications at issue. Here, Plaintiffs bring a First Amendment retaliation claim alleging that Defendants retaliated against them for failing to comply with Defendants' demands to build a hotel on their property, and that Defendants specifically sought to harm Plaintiffs to coerce them into refraining from engaging in protected conduct. Plaintiffs notably did *not* bring a due process claim based on the denial of the Application alone.

*George's LLC v. Bianco*, No. 08-CV-5321, 2009 WL 8668386, at *5–6 (S.D.N.Y. May 8, 2009) (holding that neither the plaintiffs' "application for inclusion of their property in the Westchester County Agricultural District," nor the "right to petition government for a certificate of occupancy, a liquor license, and building permits . . . is . . . First Amendment protected petitioning activity"), *aff'd*, 389 F. App'x 33 (2d Cir. 2010).[3]

However, even assuming the Application to MVIDA, and/or Plaintiffs' complaints about the treatment of their Application, were protected activity, Plaintiffs do not sufficiently allege that they were retaliated against merely for seeking to have their Application considered; instead, they allege that Defendants unjustifiably refused to consider the Application because they wanted a different type of facility on Plaintiffs' Property than the project for which Plaintiffs sought approval. "To state the obvious, denying a request for redress is not the same thing as retaliating against the person requesting redress." *Gregory v. Inc. Vill. of Ctr. Island*, No. 14-CV-2889, 2015 WL 5093623, at *14 (E.D.N.Y. Aug. 28, 2015) (citing *Ridgeview Partners*, 227 F. App'x at 82); *see also Reardon v. Keating*, 980 F. Supp. 2d 302, 318 (D. Conn. 2013) ("[T]here is no hint . . . of an intent by the [d]efendants to retaliate against the [plaintiffs] for having exercised their First Amendment right to petition. . . . [T]he [plaintiffs] . . . are really complaining about municipal officials' failure or refusal to agree with the [plaintiffs]' interpretations of pertinent land-use statutes and regulations, or to redress perceived wrongs

---

[3] Although at least one court in the Second Circuit has held that "applying for approvals and permits . . . is protected by the First Amendment right to petition government for the redress of grievances," *see Hampton Bays Connections*, 127 F. Supp. 2d at 373, that decision predates "[t]he Second Circuit's rulings in *Dougherty* and *Ridgeview Partners, LLC*," and the court there specifically "noted that it did not find any case holding that applying to a town planning board or similar entity for special use exception permits, site approval plans, or building permits is conduct protected by the First Amendment," *Hampshire Recreation*, 2016 WL 1181727, at *9 n.20 (citation, alterations, and quotation marks omitted).

inflicted on them."); *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 713 (S.D.N.Y. 2011)

(dismissing First Amendment retaliation claim and noting that a plaintiff does not "ha[ve] a

viable retaliation claim merely because a government official declines to remedy every wrong

identified by the plaintiff").  In cases where courts have found that plaintiffs successfully stated

First Amendment retaliation claims based on denial of land use requests, the complaints have

alleged that the denials were in retaliation for some *other* identified protected activity.  *See, e.g.*,

*Dougherty*, 282 F.3d at 91 (holding a town zoning board's "revocation of [a] previously issued

permit was retaliatory" for the plaintiff's "filing and continued prosecution of this action");

*Ruggiero v. City of Cortland*, No. 17-CV-790, 2019 WL 1978623, at *6–7 (N.D.N.Y. May 3,

2019) (finding the plaintiff stated First Amendment retaliation claim where he alleged "that he

received less favorable treatment under the [c]ity's zoning and planning laws than other,

similarly situated landlords did with respect to other, substantially similar properties" after "he

and other landlords sued the City" challenging a statute); *Lexjac, LLC v. Beckerman*, No. 07-CV-

4614, 2008 WL 11313761, at *9 (E.D.N.Y. Sept. 30, 2008) (holding First Amendment retaliation

claim was stated where the defendant, who supported one of the plaintiff's rivals in a mayoral

election, overturned the former town board's resolution giving land rights to the plaintiffs in

retaliation "against [the] [p]laintiffs for their political views and actions").  Here, Plaintiffs' own

allegations identify Defendants' motive for refusing to consider the Application:  Thomas

believed a hotel or retail space would be a better addition to the city and bring in needed sales tax

revenue, and James allegedly stood to benefit financially by brokering the deal. (SAC ¶¶ 99–101, 125, 129, 146.) Even if that motive is improper, it is not retaliatory.[4]

To the extent Plaintiffs base their retaliation claims on their "communications with Thomas and James in furtherance of the Application" or their "refus[al] to associate with James," (Pls.' Mem. 10, 16), Plaintiffs do not sufficiently allege that Defendants retaliated against them *because* of that conduct, but merely that they "refuse[d] to consider or act upon [Plaintiffs'] grievances," which does not state a retaliation claim. *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979). The alleged retaliatory conduct, i.e., the "blocking [of] the Application from consideration by the MVIDA Board," (Pls.' Mem. 10), is precisely the same conduct that Plaintiffs were complaining of to Thomas and James, and was already in motion when James met with NRP about being given an "exclusive" on the sale of the Property, preventing any inference that "such conduct prompted or substantially caused [Defendants'] action[s]," *Dougherty*, 282 F.3d at 91; *see also Reardon*, 980 F. Supp. 2d at 318 (dismissing retaliation claim because "the more plausible inference that can be drawn from the [complaint's]

---

[4] Plaintiffs also argue that Defendants "acted beyond their lawful powers by violating MVIDA's customary practice and requirements to consider in good faith and vote on duly filed applications," and that Thomas did not "have the authority to unilaterally prevent an application from review by the MVIDA." (Pls.' Mem. 11–12.) However, the failure by state officials to comply with state regulations does not, on its own, establish a constitutional violation. *See Beaudry v. McKnight*, No. 17-CV-23, 2019 WL 1296628, at *13 (D. Vt. Mar. 21, 2019) ("[A] public official's failure to follow state law is not equivalent to a federal constitutional injury." (alteration omitted) (quoting *Tallman v. County of Chautauqua*, 335 F. App'x 92, 94 (2d Cir. 2009))); *Morton v. County of Erie*, 335 F. Supp. 3d 449, 460 (W.D.N.Y. 2018) ("[T]he failure to follow state law procedures is not equivalent to a federal constitutional injury." (citing *Tallman*)); *Franza v. Stanford*, No. 16-CV-7635, 2018 WL 914782, at *10 (S.D.N.Y. Feb. 14, 2018) ("The fact that [a parole board's promulgated rule] violates New York law alone does not mean its application violates the Due Process Clause."); *Mathie v. Dennison*, No. 06-CV-3184, 2007 WL 2351072, at *7 (S.D.N.Y. Aug. 16, 2007) (explaining that the "plaintiff conflates a potential state law claim with a non-existent constitutional claim" based on allegations that a state entity adopted a policy in violation of state law), *aff'd*, 381 F. App'x 26 (2d Cir. 2010).

allegations is that the . . . [d]efendants, for some unpleaded motive, decided to favor [another party] and disadvantage the [plaintiffs]"); *Musco Propane, LLP v. Town of Wolcott*, No. 10-CV-1400, 2011 WL 3267756, at *9 (D. Conn. July 28, 2011) (dismissing retaliation claim where actions taken by town authorities after the plaintiff engaged in protected conduct "appear to be part of a continuing series of zoning decisions that began before" the protected conduct occurred); *Schubert*, 775 F. Supp. 2d at 713 (dismissing retaliation claim because, "[a]t most, [the] [p]laintiffs are merely alleging that their complaints . . . were ignored by [the] [d]efendants," and collecting cases); *cf. Osborne v. Fernandez*, No. 06-CV-4127, 2009 WL 884697, at *44 (S.D.N.Y. Mar. 31, 2009) ("Whether the [p]laintiffs' submissions would be considered or acted upon by [] the Planning Board is a separate matter that does not retain a constitutional dimension."), *aff'd*, 414 F. App'x 350 (2d Cir. 2011). Whether Defendants' desire for a hotel on Plaintiffs' Property, constructed pursuant to a deal brokered by James, was "an honorable or proper motive for [Defendants] to indulge," *Reardon*, 980 F. Supp. 2d at 318, is not relevant to Plaintiffs' retaliation claims; the only question is whether Plaintiffs' protected activity, rather than some other motive, "prompted or substantially caused [Defendants'] action[s]," *Dougherty*, 282 F.3d at 91. Even taking all allegations as true, and drawing all inferences in Plaintiffs' favor, Plaintiffs have essentially alleged an ongoing scheme in which Thomas and James used their government positions to force Plaintiffs to sell the Property to a developer selected or approved by Thomas, in a deal brokered by James. While this may constitute improper conduct by government officials, it does not reflect retaliation against Plaintiffs. Therefore, the Court finds that Plaintiffs have failed to allege sufficient facts to create a plausible inference that Defendants refused to consider the NRP Application in retaliation

against Plaintiffs for their complaints to Thomas and James about the failure to consider the Application, or Plaintiffs' refusal to use James as a real estate broker.

However, Plaintiffs' First Amendment retaliation claim, and corresponding New York State Constitutional claim, based on their filing of the Article 78 proceeding in state court, as well as this Action, sufficiently states a claim against Thomas for retaliation. This Action was initiated on December 18, 2017. (*See* Compl.) Plaintiffs did not specify in the Second Amended Complaint when the Article 78 proceeding was originally filed, but indicate that a decision in their favor was issued on April 19, 2018. (SAC ¶ 196 n.1.) Shortly thereafter, on April 30, 2018, Plaintiffs entered into a purchase agreement for the Property with Weissman, who planned to build a hotel there. However, the sale was contingent on "obtaining all necessary approvals . . . , including receiving a rezoning of the Property for hotel use," the precise use Thomas insisted he wanted for the Property. (*Id.* ¶ 186.) Plaintiffs allege that because "[t]he costs to present and process a rezoning application are significant," developers typically discuss proposed projects with elected leaders as part of their due diligence before seeking the necessary approvals through the formal process. (*Id.* ¶¶ 188–90.) However, Thomas refused to respond to any requests to meet or speak with Weissman, and Weissman ultimately terminated its contract with Plaintiffs as a result. (*Id.* ¶¶ 191–93.) When another prospective buyer entered into preliminary discussions about developing the Property in June and July 2018, Thomas and his staff similarly did not respond to requests to meet with the buyer. (*Id.* ¶ 194.) Drawing all inferences in Plaintiffs' favor, the Second Amended Complaint plausibly alleges that after Plaintiffs' initiated legal action against Thomas, he sought to make it more difficult for Plaintiffs to sell their Property even to a developer who wanted to build the precise type of facility that Thomas had previously demanded, and had publicly announced he would support. *See Dougherty*, 282 F.at

91 (holding the plaintiff stated retaliation claim based on "the timing of the permit revocation and the chronology of events prior to the revocation" where an issued land use permit was revoked "a few days" after the plaintiff sought attorneys' fees in litigation against the town); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (holding the plaintiffs stated retaliation claim where they "commenced Article 78 proceedings and attended public meetings and hearings of the Board of Trustees, the Planning Board and the ZBA to voice their concerns about the alleged [land use] violations" of a neighboring property, and alleged that the defendants declined to enforce regulations against the neighboring property in retaliation); *see also Ruggiero*, 2019 WL 1978623, at *6 ("Since *Gagliardi*, courts in this Circuit have expressed reluctance about dismissing at the pleadings stage a § 1983 First Amendment retaliation claim based on similar patterns of alleged misconduct by municipal officials.").  Although this is not the only plausible explanation, at this early stage and drawing all inferences in the non-movants' favor, the Court finds that Plaintiffs have sufficiently alleged First Amendment retaliation against Thomas based on their filing of the Article 78 proceeding and this Action.

### c.  Qualified Immunity

Defendants argue that even if Plaintiffs have stated a First Amendment retaliation claim they are entitled to qualified immunity.  (Defs.' Mem. 24–25.)  Defendants' argument focuses on the denial of financial incentives to NRP, but does not address Thomas's refusal to speak to any prospective purchaser of the Property after Plaintiffs filed legal proceedings against Defendants. In light of the absence of argument on this narrow point, the fact-intensive nature of the qualified immunity analysis, and the fact that "it [is] clearly established law that retaliation for protected speech violates the Constitution," the Court finds that "dismissal on the basis of qualified immunity is not warranted at this stage" without "the benefit of a fuller factual record." *Blue Rio*

*LLC v. Thomas*, No. 17-CV-2015, 2017 WL 4863091, at *7 (S.D.N.Y. Oct. 26, 2017).

Therefore, Defendants' Motion To Dismiss Plaintiffs' retaliation claim based on the filing of this

Action and the Article 78 Proceeding is denied.

### 2. Fourteenth Amendment – Equal Protection

Plaintiffs next assert a Fourteenth Amendment equal protection claim against Defendants

for "treat[ing] Plaintiffs differently than other property owners with similar residential

development projects."  (SAC ¶ 262.)  Plaintiffs argue that they have sufficiently stated a claim

under both a "class of one" theory and a "selective enforcement" theory.  (Pls.' Mem. 18.)

"A class-of-one claim arises when a plaintiff claims that he was 'intentionally treated

differently from others similarly situated and that there was no rational basis for the difference in

treatment.'"  *Davis v. Collado*, No. 16-CV-7139, 2018 WL 4757966, at *10 (S.D.N.Y. Sept. 30,

2018) (alterations omitted) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

"To successfully state a class-of-one selective treatment equal protection claim, a plaintiff has to

offer evidence officials 'intentionally treated' the plaintiff differently from other similarly

situated individuals."  *Id.* (citation omitted).  Specifically, "the plaintiff must allege that (i) no

rational person could regard the circumstances of the plaintiff to differ from those of a

comparator to a degree that would justify the differential treatment on the basis of a legitimate

governmental policy; and (ii) the similarity in circumstances and difference in treatment are

sufficient to exclude the possibility that the defendants acted on the basis of mistake."  *Fahs

Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (citation and quotation marks

omitted).  To survive a motion to dismiss, a complaint must include "[w]ell-pled facts showing

that the plaintiff has been treated differently from others similarly situated."  *Bishop v. Best Buy,

Co. Inc.*, No. 08-CV-8427, 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) (quoting

*Sweeney v. City of New York*, No. 03-CV-4410, 2004 WL 744198, at *5 (S.D.N.Y. Apr. 2, 2004)), *on reconsideration*, 2011 WL 4011449 (S.D.N.Y. Sept. 8, 2011), *aff'd*, 518 F. App'x 55 (2d Cir. 2013). "Plaintiffs proceeding under this theory 'must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 7 (S.D.N.Y. 2017) (quoting *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010)), *aff'd*, 705 F. App'x 50 (2d Cir. 2017); *see also Crippen v. Town of Hempstead*, No. 07-CV-3478, 2013 WL 1283402, at *6 (E.D.N.Y. Mar. 29, 2013) (noting that plaintiffs seeking to state a class-of-one claim "must demonstrate that they were treated differently than someone who is prima facie identical in all relevant respects" (italics and quotation marks omitted) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005))).

"In order to adequately allege a selective enforcement claim, a plaintiff must allege: (1) he was treated differently from other similarly situated individuals and (2) this differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Segreto v. Town of Islip*, No. 12-CV-1961, 2014 WL 737531, at *6 (E.D.N.Y. Feb. 24, 2014) (citation, alteration, and quotation marks omitted). "A plaintiff generally must satisfy both elements to establish a claim of selective enforcement," *LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999) (citation omitted), though there is some disagreement within the Second Circuit regarding the degree of similarity necessary to adequately allege an equal protection claim under this theory, *see Butler v. Bridgehampton Fire Dist.*, No. 14-CV-1429, 2015 WL 1396442, at *4 (E.D.N.Y. Mar. 25, 2015) (recognizing the "split regarding the definition of 'similarly situated' in selective enforcement and class-of-one cases"). While some

courts evaluate whether a comparator is similarly situated under the same standard used in "class of one" equal protection claims, *see, e.g.*, *Kamholtz v. Yates County*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008) (noting that "[t]he level of similarity between [the] plaintiffs and the persons with whom they compare themselves must be extremely high" in both the selective enforcement and class-of-one contexts (quotation marks omitted)), *aff'd*, 350 F. App'x 589 (2d Cir. 2009), others apply a less demanding standard to selective enforcement claims, *see, e.g.*, *Tower Props. LLC v. Vill. of Highland Falls*, No. 14-CV-4502, 2015 WL 4124499, at *8 (S.D.N.Y. July 7, 2015) (adopting "a less stringent standard" whereby the "[p]laintiff must identify comparators whom a prudent person would think were roughly equivalent" (citations, alterations, and quotation marks omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008) (explaining that a selective enforcement claim requires a plaintiff and comparator to be "similarly situated in all material respects" (citation and quotation marks omitted)).

Generally, whether two comparators "are similarly situated is a factual issue that should be submitted to the jury." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001). At the motion to dismiss stage, a court must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated. Thus, "[w]ell-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of such a claim [and] [c]onclusory allegations of selective treatment are insufficient to state an equal protection claim." *Bishop*, 2010 WL 4159566, at *11 (citation and quotation marks omitted) (dismissing the plaintiff's equal protection claim because he failed to allege any similarly situated individuals who were treated differently); *see also DePrima v. City of N.Y. Dep't of Educ.*, No. 12-CV-3626,

2014 WL 1155282, at *6 (E.D.N.Y. Mar. 20, 2014) (dismissing selective enforcement claim where the plaintiff's allegations lacked "any facts showing that [certain individuals] [were] similarly situated to [the] [p]laintiff"); *Segreto*, 2014 WL 737531, at *7–8 (dismissing equal protection claim where the "[p]laintiffs merely allege[d] that others [were] allowed to get permits, but it [was] unclear whether those properties ha[d] any circumstances similar to [the] [p]laintiffs"); *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 434 (S.D.N.Y. 2013) ("While a plaintiff is not required to proffer evidence of similarly situated individuals at the motion to dismiss stage, the court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." (citation and quotation marks omitted)).

Here, "[r]egardless of which standard the Court applies—the 'extremely high degree of similarity' standard used in class-of-one cases or the less demanding standard some courts apply to selective enforcement claims—these allegations fall far short of identifying a similarly situated comparator." *Panzella*, 231 F. Supp. 3d at 9 (citation omitted). Plaintiffs allege that two projects that MVIDA approved, MVP and Enclave, were highly similar to the NRP Project. (SAC ¶¶ 259–80.)[5] However, the only allegations included about these projects are that they "ha[d] the same multi-family residential use as the NRP Project," and that Enclave, like the NRP Project, was "located in a former industrial area" and "serve[d] the same market of individuals seeking to rent one and two bedroom units at market rate prices in Mount Vernon." (*Id.* ¶¶ 267–68, 271.) Plaintiffs themselves identified the Property's location near Wilson Woods Park as a

_____

[5] Plaintiffs also include WP East as a potential comparator; however, that project was approved by a MVIDA Board made up of entirely different members, and thus cannot serve as a similarly situated comparator. *See Baity v. Kralik*, 51 F. Supp. 3d 414, 447 (S.D.N.Y. 2014) (collecting cases for the proposition that "[t]o be considered similarly situated, an individual must have been treated more favorably by the same decisionmaker that dealt with the plaintiff").

primary reason Thomas claimed to want a public hotel or retail space on the land, but made no allegations about proximity to public spaces with respect to Enclave or MVP. (*Id.* ¶ 99.) Plaintiffs also identified various factors that MVIDA considers when reviewing applications, such as estimated job creation, generation of tax revenue, and tax exemptions sought, (*id.* ¶ 86), but includes no allegations about these considerations with respect to the purported comparators, *see Lilakos v. New York City*, No. 14-CV-5288, 2017 WL 4898193, at *7 (E.D.N.Y. Oct. 25, 2017) (dismissing class-of-one claim where "the comparator properties listed by [the] plaintiffs . . . [we]re not similarly situated in all material respects" because, although also two-family properties, the plaintiffs "failed to allege" that they shared several specific traits relevant to the challenged governmental action), *adopted by* 2018 WL 1168577 (E.D.N.Y. Mar. 5, 2018); *Gregory*, 2016 WL 4033171, at *7 (dismissing complaint where the "plaintiff's own allegations make clear that [the comparator property] was not in fact identically situated" because, despite allegedly being "almost identically situated geographically," a neighbor of the plaintiff's property objected to the sought zoning variance and New York law identified undesirable neighborhood change as a relevant zoning consideration); *Witt v. Vill. of Mamaroneck*, No. 12-CV-8778, 2015 WL 1427206, at *6 (S.D.N.Y. Mar. 27, 2015) (holding the plaintiffs "fail[ed] to allege that any other homeowners were similarly situated in all material respects" because, inter alia, they included no allegations about the cost of reconstruction, and "the applicability of [the local regulation at issue] hinge[d]" on this consideration), *aff'd*, 639 F. App'x 44 (2d Cir. 2016); *see also New Page at 63 Main, LLC v. Inc. Vill. of Sag Harbor*, 674 F. App'x 23, 27 (2d Cir. 2016) (affirming dismissal of equal protection claim based on denial of outdoor seating permit where the plaintiffs "vaguely refer to other restaurants with outdoor seating, but they identify no comparator with sufficient specificity to meet th[e] high standard," including failing to include

specific allegations "about other restaurants exceeding maximum occupancy loads or disputing occupancy limits"). Despite Plaintiffs' detailed allegations about the many ways in which the NRP project met the criteria considered by MVIDA, there are virtually no specific allegations about the degree to which the comparator properties fulfilled those same criteria. Plaintiffs' assertion that these considerations "do not go to the issue of how the applications were processed and treated . . . nor . . . explain Defendants' disparate actions in refusing to even consider in good faith and vote on the subject Application" ignores their own allegations. (Pls.' Mem. 20.) The Second Amended Complaint alleges that NRP "made an introductory presentation of its Project to the MVIDA" on March 31, 2017, and had ongoing discussions with Thomas and James about the Application, (*see, e.g.*, SAC ¶¶ 108, 118, 122, 129, 134), and that Defendants specifically identified the location and related potential tax revenue as the reason they sought a hotel or retail facility on the Property, (*id.* ¶¶ 99, 114, 122).

For these reasons, Plaintiffs have failed to plead that the comparator properties were similarly situated in all material respects, and their Fourteenth Amendment claim must be dismissed.

### 3. Section 1985 Conspiracy

"The elements of a claim under § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is deprived of any right of a citizen of the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999) (citation, alteration, and quotation marks omitted). To satisfy the first element, Plaintiff must allege "a meeting of the minds, such that . . . [D]efendants entered into an agreement, express or tacit, to achieve the unlawful end." *Williams v. Long Beach Mortg. Co.*, No. 15-CV-5952, 2016

WL 5720810, at *7 (S.D.N.Y. Sept. 30, 2016) (internal quotation marks omitted), *aff'd*, 709 F. App'x 92 (2d Cir. 2018).

Plaintiffs have only sufficiently alleged one constitutional violation: that Thomas retaliated against them by refusing to meet with any prospective buyers of the Property after they filed legal actions against Defendants. However, there are no allegations that anyone other than Thomas was involved in that retaliation, and Plaintiffs have thus failed to allege a meeting of the minds with respect to violation of their constitutional rights. Plaintiffs' conspiracy claim is therefore dismissed. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." (citation and quotation marks omitted)); *Blue Rio*, 2017 WL 4863091, at *6 (holding the "fail[ure] to plead any agreement between" the defendants "is not enough under the heightened pleading standard for conspiracy" to state a claim).

### 4. General Municipal Law and Common Law Claims

Plaintiffs assert three claims against James under the GML, alleging that James violated GML §§ 801 and 805. (SAC ¶¶ 291–310.) However, "[t]hese provisions do not provide for a private right of action." *County of Washington v. Ctys. of Warren & Washington Indus. Dev. Agency*, No. 93-CV-0086, 1997 WL 152001, at *7 n.24 (N.D.N.Y. Mar. 31, 1997), *aff'd*, 2 F. App'x 71 (2d Cir. 2001); *see also Tuxedo Land Tr., Inc. v. Town of Tuxedo*, 950 N.Y.S.2d 611 (Sup. Ct. 2012) ("[T]here is no cause of action to void the determination of a municipal body based upon allegations that one or more of its members violated [GML § 805-a(1)]." (collecting cases)), *aff'd*, 977 N.Y.S.2d 272 (App. Div. 2013). Rather, "[only] [t]wo sanctions are prescribed by the statute for a violation of the provisions of article 18 [of the GML]. It renders

void and unenforceable any contract willfully entered into in which there is an interest prohibited by its terms. . . , [and] it makes a willful violation of its provisions by a municipal officer or employee a misdemeanor." *Landau v. Percacciolo*, 412 N.Y.S.2d 378, 383 (App. Div. 1978), *aff'd*, 407 N.E.2d 412 (N.Y. 1980). Plaintiffs do not seek either of these remedies.

Plaintiffs also assert a claim for "common law conflict of interest" based on Defendants' "ulterior motives" with respect to the Property. (SAC ¶¶ 311–19.) For their GML and common law claims, Plaintiffs "seek a declaration that the bias and self-dealing conduct of Thomas and James violated common law and statutory conflict of interest laws, respectively." (Pls.' Mem. 28.) Defendants argue that there is no justiciable controversy with respect to this claim because the NRP Application is no longer pending, and that any opinion rendered by this Court would therefore be advisory in violation of the Declaratory Judgment Act, 28 U.S.C. § 2201(a). (Defs.' Mem. 18–21.) The Court agrees.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). However, "Defendants are correct that prospective declaratory relief cannot be used solely to adjudicate a defendant's past conduct." *Gov't Emps. Ins. Co. v. Saco*, No. 12-CV-5633, 2014 WL 639419, at *7 (E.D.N.Y. Feb. 18, 2014) (citation, alteration, and quotation marks omitted); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Int'l Wire Grp., Inc.*, No. 02-CV-10338, 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003) ("[D]eclaratory relief is intended to operate prospectively. There is no basis for declaratory relief where only past acts are involved." (citation omitted)).

"An examination of Plaintiff[s'] requests for declaratory relief indicate that all ask the Court to make a determination regarding, or to adjudicate, past conduct." *Simso v. State of Conn.*, No. 06-CV-301, 2006 WL 3422194, at *9 (D. Conn. Nov. 28, 2006). Although Plaintiffs argue that a declaratory judgment that James and Thomas violated state and common law conflict of interest rules "will serve a useful purpose of eschewing impropriety in . . . public offices . . . , and will afford Plaintiffs necessary relief of a declaration that the personal interests of Thomas and James should not come at the expense of Plaintiffs," (Pls.' Mem. 29), they "do[] not ask for a judgment which would settle some dispute and thus affect the future behavior of [James and Thomas] towards . . . [P]laintiff[s]," and declaratory judgment is therefore inappropriate, *Simso*, 2006 WL 3422194, at *9; *see also KM Enters., Inc. v. McDonald*, No. 11-CV-5098, 2012 WL 4472010, at *20 (E.D.N.Y. Sept. 25, 2012) (dismissing claim for declaratory relief because "[t]here is no current dispute between the State and the Plaintiff that must be settled"), *aff'd*, 518 F. App'x 12 (2d Cir. 2013). Plaintiffs nowhere argue that the declaratory relief they seek would prevent any ongoing or future harm. Plaintiffs' GML and common law claims must therefore be dismissed for failure to state a claim for which relief can be granted. *See Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, No. 16-CV-6370, 2017 WL 6729854, at *12 (E.D.N.Y. Oct. 31, 2017) (dismissing claim because "[the] [p]laintiff seeks declaratory relief concerning [the] [d]efendants' past conduct"), *aff'd*, 736 F. App'x 274 (2d Cir. 2018); *Shelley v. Brandveen*, No. 06-CV-1289, 2012 WL 3903472, at *3 (E.D.N.Y. Sept. 6, 2012) (dismissing claim where "the relief [the] [p]laintiffs are seeking would have no effect on the future 'rights and other legal relations' of the parties," but would rather constitute "an advisory opinion with respect to the past conduct of [the] Defendant" (quoting 28 U.S.C. § 2201)); *Simso*, 2006 WL 3422194, at *9 ("Because none of [the] [p]laintiff's claims present a proper subject for

declaratory relief, they are . . . dismissed on the ground that they fail to state a claim for which relief can be granted.").

### 5. Article 78 Claims

Plaintiffs' final two causes of action are brought pursuant to N.Y. C.P.L.R. § 7803. "The overwhelming majority of district courts confronted with the question of whether to exercise supplemental jurisdiction over Article 78 claims have found that they are without power to do so or have declined to do so." *E. End Eruv Ass'n, Inc. v. Town of Southampton*, No. 13-CV-4810, 2014 WL 4826226, at *16 (E.D.N.Y. Sept. 24, 2014) (collecting cases); *see also De Jesus v. City of New York*, No. 10-CV-9400, 2012 WL 569176, at *4 (S.D.N.Y. Feb. 21, 2012) ("The Court cannot exercise jurisdiction over [the] plaintiff's claims challenging administrative determinations."); *Cartagena v. City of New York*, 257 F. Supp. 2d 708, 709 (S.D.N.Y. 2003) ("The Article 78 proceeding is a novel and special creation of state law, and state law provides that the Supreme Court has exclusive jurisdiction over Article 78 claims." (citation and quotation marks omitted)). "Accordingly, the Court follows the essentially unanimous position of the New York district [c]ourts and declines to exercise jurisdiction over [P]laintiffs' state-law claims brought under Article 78." *Kent v. New York*, No. 11-CV-1533, 2012 WL 6024998, at *11 (N.D.N.Y. Dec. 4, 2012); *see also N.Y. Civ. Liberties Union v. State*, 824 N.E.2d 947, 952–53 (N.Y. 2005) ("Inasmuch as [the] plaintiffs seek to test the action or inaction of a public officer, their sole available remedy lies. . . in a CPLR [A]rticle 78 proceeding seeking mandamus to compel."). Plaintiffs' Article 78 claims are therefore dismissed.

### III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is granted in part and denied in part. All Plaintiffs' claims are dismissed except for their First Amendment and New

York State Constitutional claim for retaliation based on the filing of this Action and an Article 78 proceeding. Because this is the first adjudication of Plaintiffs' claims on the merits, the dismissals are without prejudice. Should Plaintiffs choose to file a third amended complaint, they must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The third amended complaint will replace, not supplement, the Complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiffs wish the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiffs fail to abide by the 30-day deadline, the case will proceed on Plaintiffs' remaining retaliation claim.

The Clerk of the Court is respectfully requested to terminate the pending motion. (Dkt. No. 34).

SO ORDERED.

Dated: September *10*, 2019
White Plains, New York

KENNETH M. KARAS
United States District Judge